## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| 3E MOBILE, LLC, | ) |
| | ) |
| Plaintiff and Counter Defendant, | ) |
| | ) |
| v. | )        Case No. 14-cv-1975 (GMH) |
| | ) |
| GLOBAL CELLULAR, INC. | ) |
| | ) |
| Defendant and Counter Claimant. | ) |
| | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is the rare contract case in which two fairly sophisticated parties—Plaintiff and Counter Defendant 3E Mobile, LLC ("Plaintiff" or "3E") and Defendant and Counter Claimant Global Cellular, Inc. ("Defendant" or "Global")—entered into an agreement about which they had such fundamentally different understandings that it cannot be said that they had the required "meeting of the minds" to form an enforceable agreement. That failure of accord is evidenced (and perhaps was exacerbated) in part by the vagueness of the written agreement; but it was more clearly manifested by the parties' discordant conduct during the approximately eleven months that each behaved in keeping with its apparent perception of the letter and spirit of the document. Upon consideration of the record and the evidence and testimony presented at trial,[1] the Court finds that no enforceable agreement was formed, and that, therefore, neither can be liable for breach.

---

[1] The documents relevant to the resolution of this action include: (1) the trial transcripts from the three-day bench trial (ECF No. 72 (Mar. 20, 2018); ECF No. 79 (April 20, 2018); ECF No. 80 (Apr. 19, 2018 (morning session)); ECF No. 81 (Apr. 19, 2098 (afternoon session)); (2) Defendant/Counterclaimant Global Cellular Inc.'s Proposed Findings of Fact and Conclusions of Law (ECF No. 86); (3) Plaintiff 3E Mobile, LLC's Proposed Findings of Fact and Conclusions of Law (ECF No. 87); Plaintiff 3E Mobile LLC's Brief in Reply to Defendant's Proposed Findings of Fact and Conclusion of Law (ECF No. 88); Defendant/Counterclaimant Global Cellular Inc.'s Opposition to Plaintiff/Defendant in Counterclaim 3E Mobile LLC's Proposed Findings of Fact and Conclusion of Law (ECF No. 89). References to the exhibits admitted at trial will be identified by the ECF number assigned in the parties' joint pretrial statement (ECF Nos. 68-2 through 68-74). The Court's findings of fact are based on the testimony and exhibits

# I. PROCEDURAL HISTORY

This lawsuit arises from a dispute over a putative contract between 3E and Global that was entered into in September 2013. In November 2014, 3E filed its complaint alleging that Global had breached the contract, known as the Manufacturing Agreement or the Manufacturer Agreement.[2] ECF No. 1. In January 2015, Global filed a counterclaim alleging that 3E had breached that agreement and the implied covenant of good faith and fair dealing or that 3E had been unjustly enriched. ECF No. 5 at 9–14. 3E then filed a motion to dismiss Global's counterclaims or, in the alternative, to strike its request for attorney's fees. ECF No. 11–2. Judge Sullivan denied the motion to dismiss and motion to strike on August 11, 2015.[3] *See 3E Mobile, LLC v. Glob. Cellular, Inc.*, 121 F. Supp. 3d 106 (D.D.C. 2015).

An initial scheduling order was entered in September 2015 (ECF No. 26), and the parties engaged in discovery and attempted, unsuccessfully, to mediate the dispute (ECF No. 31). A bench trial was scheduled to begin on January 24, 2017. ECF No. 33 at 2. However, discovery disputes arose, and Global filed a motion to compel 3E to respond to document requests and interrogatories in August 2016 (ECF No. 38) and a motion for sanctions in October 2016 (ECF No. 41). In light of the pending motions, the trial date was adjourned *sine die*. Minute Order dated Nov. 30, 2016. Noting that 3E had not filed an opposition to Global's motion to compel, Judge Sullivan granted it on December 22, 2016. Minute Order dated Dec. 22, 2016. Judge Sullivan also granted in part and denied in part Global's motion for sanctions, finding that 3E's conduct did not merit issue-related sanctions, such as an adverse evidentiary inference, but imposing monetary sanctions in

---

that the parties submitted during the bench trial, the Court's observations of the demeanor and credibility of the witnesses, and the record as a whole.

[2] The document is titled "Manufacturer Agreement," however, some of its provisions term it the "Manufacturing Agreement." *Id.*, § 15, 20. The Court refers to it as the Manufacturing Agreement throughout this opinion.

[3] The parties' arguments and Judge Sullivan's decision are discussed more fully below in Section III.D.

the form of attorney's fees. *3E Mobile, LLC v. Global Cellular*, 222 F. Supp. 3d 50, 57 (D.D.C. 2016). The trial date was eventually rescheduled to February 26, 2018. Minute Order dated Sept. 6, 2017.

Soon after the trial date was rescheduled, the parties consented to the jurisdiction of the undersigned for all purposes pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 73.1. Minute Order dated Oct. 20, 2017. Therefter, the date for commencement of the bench trial was again rescheduled to March 20, 2018. ECF No. 65. The trial began as scheduled on that date and continued on April 19, and 20, 2018.[4] At trial, 3E called three witnesses: Tommy Wang and Harry Wang, brothers who are the owners of 3E (ECF No. 72 at 35), and Walter Tymoczko, its Chief Financial Officer (*id.* at 178). Global also called three witnesses: Konstantinos (known as "Taki") Skouras, CEO of Gobal (ECF No. 80 at 54–55), Joseph Brown, Global's Chief Product Officer (ECF No. 81 at 76–77), and Susan Duan, Global's Procurement and Logistics Manager (ECF No. 79 at 10). After testimony concluded, the parties simultaneously submitted proposed findings of fact and conclusions of law on June 8, 2018 (ECF No. 86; ECF No. 87) and responses on June 22, 2018 (ECF No. 88; ECF No. 89). The Court then heard closing arguments on July 13, 2018.

## II. LEGAL STANDARD

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, in an action tried without a jury, the Court "must find the facts specially and state its conclusions of law separately."[5] Fed. R.

---

[4] The U.S. District Court for the District of Columbia was closed due to inclement weather on March 21, 2018, necessitating a continuation of the trial to April 2018.

[5] Pursuant to a stipulation of the parties, the proposed findings of fact and conclusions of law "double as motions for judgment as a matter of law." ECF No. 76. Global asserts that the stipulation is intended to allow the Court to decide this dispute "under Federal Rule [of Civil Procedure] 50." ECF No. 86 at 38 n.5. However, "[b]y its terms Rule 50 applies in cases tried to a jury," and it is therefore "not appropriate to make a Rule 50 motion in a bench trial or for the Court to rule on such a motion." *Smith v. Haden*, 872 F. Supp. 1040, 1043 (D.D.C. 1994), *aff'd*, 69 F.3d 606 (D.C. Cir. 1995); *see also* 9B Arthur R. Miller, Federal Practice and Procedure § 2523 (3d ed.) ("The motions described in Federal Rule 50 are available only in cases tried to a jury that has the power to return a binding verdict. Thus, it does not apply to cases tried without a jury or to those tried to the court with an advisory jury." (footnotes omitted)). Rather,

Civ. P. 52(a)(1). "In setting forth the findings of fact, the court need not address every factual contention and argumentative detail raised by the parties, [n]or discuss all evidence presented at trial." *Yah Kai World Wide Enters., Inc. v. Napper*, 292 F. Supp. 3d 337, 344 (D.D.C. 2018) (alteration in original) (quoting *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015)), *appeal dismissed*, No. 18-7041, 2018 WL 4641349 (D.C. Cir. May 30, 2018). "The Court is neither 'require[d]' nor 'encourage[d]' 'to assert the negative of each rejected contention as well as the affirmative of those which they find to be correct.'" *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 188 F. Supp. 3d 22, 34 (D.D.C. 2016) (alterations in original) (quoting *Schilling v. Schwitzer–Cummins Co.*, 142 F.2d 82, 84 (D.C. Cir. 1944), *aff'd*, 743 F. App'x 457 (D.C. Cir. 2018). Instead, the Court need only "make brief, definite, pertinent findings and conclusions on the contested matters" that are "sufficient to allow the appellate court to conduct meaningful review." *Yah Kai World Wide Enters.*, 292 F. Supp. 3d at 344 (quoting *Wise v. United States*, 145 F. Supp. 3d 53, 57 (D.D.C. 2015)). Such findings and conclusions "may be incorporated in any opinion or memorandum of decision the court may file." *Paleteria La Michoacana*, 188 F. Supp. 3d at 34 (quoting *Defs. of Wildlife, Inc. v. Endangered Species Sci. Auth.*, 659 F.2d 168, 176 (D.C. Cir. 1981)).

### III. FINDINGS OF FACT

Global is a product company and wholesaler that sells accessories for mobile devices, such as cell phone cases, to a related company, Cellairis Franchise, Inc. ("Cellairis"), which franchises kiosks in the common areas of shopping malls. ECF No. 80 at 55–56. Global, a Georgia

---

Rule 52 of the Federal Rules of Civil Procedure is the "proper vehicle for rendering judgment" after a bench trial. *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 n.1 (5th Cir. 2016); *see also* 9C Arthur R. Miller, Federal Practice and Procedure § 2573 (3d ed.) ("Federal Rule 52 applies to any civil action tried without a jury or with an advisory jury."). The distinction is one of some consequence, as Rule 52 "permits the court to make a determination 'in accordance with its own view of the evidence'" and does not require the court to draw inferences in favor of one party or the other. *Fairchild*, 815 F.3d at 964 n.1 (quoting *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006)).

corporation, was founded in 2000 by Taki Skouras, who is the C.E.O. of both Global and Cellairis, Joseph Brown, the Chief Product Officer of Cellairis, and another partner. ECF No. 68-4 at 1; ECF No. 80 at 56–57; ECF No. 81 at 76–77. Global obtains its products both from manufacturers, which fabricate the products Global orders, and from wholesalers, which generally buy products that another manufacturer builds and sells them to companies like Global. ECF No. 81 at 77–78. Most of the manufacturers and wholesalers with which Global works are located in the People's Republic of China. ECF No. 80 at 63; ECF No. 81 at 77.

In 2012, Crystal Icing, LLC ("Crystal Icing"), a company that also sold cell phone cases, sued Global and Cellairis in the U.S. District Court for the Western District of New York alleging that certain of Global's cell phone cases infringed on designs copyrighted by Crystal Icing. ECF No. 80 at 64–65. In April or May of 2013, 3E, a Pennsylvania company owned by brothers Tommy and Henry Wang through their company TMD Holdings,[6] acquired Crystal Icing for a cash payment of $10,000, assumption of $25,000 in leases, and payment of an outstanding legal bill of approximately $30,000 connected with the infringement action against Global and Cellairis. ECF No. 68-4 at 1; ECF No. 72 at 35–36, 42–43, 129, 197–98, 200. In that transaction, 3E acquired Crystal Icing's trademarks and inventory as well as its copyright infringement case. ECF No. 72 at 198–99. 3E also took on two of Crystal Icing's employees. *Id.* 3E is not a manufacturing company but was created for the sole purpose of acquiring Crystal Icing and another mobile accessories company (called Lex Mobile) and merging them together to become the mobile accessories division of TMD. *Id.* at 129.

---

[6] The evidence does not always distinguish between TMD and 3E. This decision will refer to both entities as 3E unless there is a particular reason to distinguish between them.

## A.     Mediation of Copyright Infringement Case

In June 2013, after 3E had acquired Crystal Icing, the parties to the copyright infringement case engaged in a mediation of the dispute in Rochester, New York. ECF No. 72 at 45, 48. Global was represented by Mr. Skouras and Mr. Brown; 3E was represented by Mr. Tymoczko and Tommy Wang. *Id.* at 45, 179–80; ECF 80 at 67; ECF 81 at 82. During the discussions, Global became interested in 3E's representations regarding its expertise in manufacturing and sourcing products from China; 3E was intrigued by Global's representations regarding the size of Cellairis and the extent of their purchasing needs. ECF No. 72 at 45; ECF No. 80 at 67–68. The parties discussed having 3E manufacture product for Global as well as having 3E purchase products from one of Global's suppliers and provide those products to Global. ECF No. 72 at 45, 70, 160; ECF No. 80 at 72. One of the ways that the latter strategy would benefit the parties was through a Chinese intra-country tax credit (that is, a tax credit on transactions between Chinese companies) that could be realized if 3E took a purchase order from Global for goods to be sourced from China, substituted one of 3E's affiliates located in China as the buyer, and placed that modified purchase order with a Chinese supplier. ECF No. 72 at 148–151, 159–60, 177; ECF No. 80 at 73–74, 76–77; ECF No. 81 at 82. Even if 3E placed an order with one of Global's then-current Chinese suppliers, the tax credit would kick in, and 3E could share that credit with Global by discounting the price of the order. ECF No. 72 at 159–60; ECF No. 80 at 47–48, 74, 77–78.

After a day of discussions, the parties signed a term sheet. ECF No. 68-2; ECF No. 72 at 47. As relevant here, the document reflected the parties' agreement that the Crystal Icing litigation would be dismissed once a settlement agreement was executed and that Global would pay 3E $100,000 within five days of the dismissal, without admitting liability, and would refrain from

using the accused designs.  ECF No. 68-2, §§ 3–4, 6.  The term sheet further stated that 3E and Global would

> enter into a comprehensive manufacturing agreement (the "Manufacturing Agreement"), which will contain the following terms:
>
>> a.   For 12 months, Global will pay 3E Mobile $25,000 per month, with the first payment due on the 60th day after the settlement agreement is signed.
>>
>> b.   For 24 months, beginning immediately after the 12-month period referenced above, Global will pay 3E Mobile $20,000 per month.
>>
>> c.   The payments referenced in a and b above[] will be held by 3E Mobile as a credit for use by Global in the event that Global places an order (or orders) for product, as follows:  Global will receive a 20% credit on all orders placed with 3E Mobile within three years and 60 days from the date of the settlement agreement, to be paid by the credit funds referenced above. . . .  The purpose of these funds is to guarantee 3E Mobile a 20% credit on $3.9 million in purchases by Global.
>>
>> d.   At any time, Global can place orders with 3E Mobile.  The first $3.9 million of such orders will be governed in accordance with the Manufacturing Agreement and used against the credit terms above. . . .
>>
>> e.   If at the end of three years and 60 days from the date of the Settlement Agreement Global has an unused credit with 3E Mobile, such unused funds shall become the sole and exclusive property of 3E mobile . . . .

*Id.*, § 7.  The document also included terms that guaranteed the quality of products 3E provided to Global and mandated a price equal to or less than Global then paid.  *Id.*, § 7.j.  It further addressed situations in which "Global provides 3E Mobile a product to manufacture,"—requiring provision of a sample for Global's approval and allowing that, if 3E could not provide the product "for any reason," it would "have the product produced by one of Global's current manufacturers."  *Id.*  In that event, Global had the responsibility to provide 3E "information sufficient to identify and

contact current manufacturers and to place orders with such manufacturers." *Id.*  There was also a notice-and-cure provision in the event of a default by either party.  *Id.*, § 7.i.

**B.      Manufacturing Agreement and Settlement Agreement**

On September 30, 2013, the parties entered into a "Manufacturing Agreement" that closely tracked the provisions describing the "comprehensive manufacturing agreement" in the term sheet. The document designated 3E as an approved manufacturer for products to be sold to Global (and thereafter to be used in or resold by Cellairis kiosks), and "contemplate[d] that during the [36-month] Term [of the agreement] Global shall purchase a minimum of three million nine hundred thousand dollars ($3,900,000) in Product from [3E]."  ECF No. 68-4 at 1 & §§ 1, 4.A, 12.  The agreement could then be renewed for successive twelve-month periods.  *Id.*, § 12.

Global agreed to pay 3E "an advance against purchases of Product to be made by Global" in the amount of $25,000 per month for twelve months (beginning sixty days after September 30, 2018, the effective date of the agreement) and $20,000 per month for the next 24 months, for a total of $780,000.[7]  *Id.*, §§ 4.B & C.  Those payments were to be held by 3E "as a credit for use by Global in the event that Global places an order (or orders) for Product," such that Global would "receive a twenty percent (20%) credit on all orders placed with [3E] during the Term"; the purpose of the payments was "to guarantee [3E] a twenty percent (20%) credit on the three million nine hundred thousand dollars ($3,900,000) in purchases of Product by Global."  *Id.*, § 4.D.  If Global placed orders in amounts that outpaced the 20% credit Global had already paid in, Global was relieved from making further advance payments until the amount of the credit caught up to 20%

---

[7] ($25,000 x 12) + ($20,000 x 24) = $780,000.

of the amount of the purchases.[8]  *Id.*, § 4.E.  If Global ordered $3.9 million in product from 3E, Global would recoup (or be relieved from paying) the entire $780,000 in anticipated advance payments.[9]  If there was unused credit at the end of the 36-month term of the agreement, 3E would keep the money.  *Id.*, § 4.F.  This arrangement provided security for 3E by ensuring payments of at least $780,000 and encouraging Global to purchase the contemplated $3.9 million in products from 3E, thus cementing the relationship between the two companies.  ECF No. 72 at 160–61; ECF No. 80 at 69–71.

Under Section 2.C of the Manufacturing Agreement, 3E could supply products to Global by manufacturing the products itself or by sourcing them from Global's existing suppliers.  ECF No. 72 at 70, 262; ECF No. 80 at 51; ECF No. 81 at 31–32, 49.  It is worth quoting that section at some length, as it is at the heart of this dispute:

> If Global provides [3E] a Product to manufacture, [3E] shall have thirty (30) days to create a mold and provide a sample of such Product for approval by Global. Global shall pay the cost of any such mold, which shall be at a cost less than or equal to the costs for molds currently charged to Global by its current manufacturers for the same molds . . . .  After the date of approval. [3E] shall provide the Product to Global within a mass production time equivalent to Global's then current manufacturers of equivalent products.  In the event [#E] cannot provide the product for any reason, [3E] may arrange to have the Product produced by one of Global's current manufacturers.  In that event, Global will provide [3E] with information sufficient to identify and contact Global's current manufacturers and to place orders with such manufacturers.

ECF No. 68-4. § 2.C.  Thus, if Global "provide[d] 3E a Product to manufacture," 3E would have 30 days to create a mold (at Global's expense) and send a sample to Global for its approval.  *Id.*, § 2.C.  If Global approved a sample made by 3E, 3E was to send Global a written document with

---

[8] This scheme is perhaps best illustrated by an example included in the document: "if Global places an order for three million dollars . . . in Product within the first sixty . . . days of the Term, Global will not be required to make the first six hundred thousand dollars . . . of advance payments . . . ."  *Id.*, § 4.E.

[9] $3,900,000 x 20% = $780,000.

the final specifications for the product. ECF No. 68-4, § 2.E. 3E was also obligated to provide the product to Global "within a mass production time equivalent to that of Global's then current manufacturers of equivalent products." *Id.*, § 2.C. However, if 3E was unable to provide a requested product "for any reason," it "may arrange to have the Product produced by one of Global's current manufacturers. In that event, Global [would] provide [3E] with information sufficient to identify and contact Global's current manufacturers and to place orders with such manufacturers." *Id.* In any case, 3E agreed to sell products to Global "at a price less than or equal to prices currently charged to Global . . . by its current manufacturers." *Id.*, § 2.A. Moreover, for products that 3E purchased "using one of Global's then current manufacturer[s]," payment for the products would be "on the same terms and conditions as the manufacturing agreement executed between the parties for the manufacturer being utilized." *Id.*, § 2.G. Those provisions provided protection for Global by ensuring that, if 3E could not make the products desired, it could purchase them from Global's existing suppliers and sell them to Global on the same or better terms. ECF No. 80 at 69–70, 90. Global could "place orders with [3E] at any time during the Term." ECF No. 68-4, § 4.E. However, the Manufacturing Agreement does not describe the manner in which Global was to "provide" a product to 3E or otherwise place an order.

The default provision of the Manufacturing Agreement requires the non-defaulting party to provide notice to the defaulting party within ten days of the alleged default, after which the defaulting party would have 30 days to cure. ECF No. 68-4, § 15. If a cure were not accomplished in that period, the non-defaulting party could terminate the agreement. *Id.* If Global defaulted on its advance payments "and its failure to cure its default [led] to termination," Global's advance payments would become due immediately. *Id.*

The Manufacturing Agreement contains an integration clause stating that the document "constitutes the entire Agreement between Global and [3E] regarding the Approval [of 3E as a manufacturer for Global] and supersedes any and all prior negotiations, understandings, and/or agreements, oral or written, between the parties hereto with respect to the subject matter hereof." *Id.*, § 23. It further requires any modifications to be set out in "an instrument in writing signed by the parties." *Id.*, § 21. The document also chooses this District as the exclusive forum for "disputes regarding the Manufacturing Agreement" and chooses Pennsylvania law to govern its interpretation. *Id.*, § 20.

On October 3, 2013, 3E and Global entered into the "Settlement Agreement." ECF No. 68-5 at 1, 7. That document recites that the parties desired to settle the Crystal Icing action and had entered into a term sheet on June 25, 2013, "which contemplates the Parties' execution of certain formal agreements." The parties agreed to settle and dismiss the case for a payment from Global to 3E of $100,000 and a promise that Global would stop selling the designs at issue in the action. *Id.*, §§ 1–4, 6. The Settlement Agreement also states that "3E and Global will enter into a manufacturing agreement," which was to be attached to the Settlement Agreement as an exhibit.[10] *Id.*, § 7. The Settlement Agreement contains an integration clause asserting that it "contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior negotiations or agreements between the Parties." *Id.*, § 16. Unlike the Manufacturing Agreement, however, it does not mandate an exclusive forum to adjudicate any disputes that may arise or a governing body of law.

---

[10] The version of the Settlement Agreement provided to the Court as a trial exhibit does not attach the Manufacturing Agreement. However, there is testimony indicating that the Manufacturing Agreement was originally attached to the Settlement Agreement. ECF No. 72 at 63.

## C. Post-Agreement Conduct

Soon after the effective date of the Manufacturing Agreement, at the end of October 2013, Susan Duan, Global's Purchasing Team Lead, reached out to 3E via email with a request to produce an injection mold for one of Global's cell phone cases. ECF No. 68-7; ECF No. 79 at 16–18. Later that month, Global made a similar request in connection with two other cases. ECF No. 68-14; ECF No. 79 at 18–19. Neither of those projects came to fruition; that is, 3E neither manufactured the products nor purchased them from Global's current suppliers. ECF No. 79 at 18–19, 36–37.

Consequently, in November 2013, the parties began discussions to "nail down the ordering process." ECF No. 68-17; ECF No. 79 at 36; ECF No. 80 at 79. In mid-November, the parties held a meeting attended by Mr. Brown and Ms. Duan from Global and, from 3E Henry Wang and Lisa Kennedy, 3E's director of sourcing. ECF No. 72 at 103, 214; ECF No. 79 at 36–37; ECF No. 80 at 82–83. At that meeting, 3E stated that it would help come up with a new process by which Global could order products from 3E and help Global reduce costs by finding new manufacturers for its products. ECF No. 79 at 37–38. 3E later proposed a system in which Global would "carbon copy" 3E on its purchase orders, thus allowing 3E access to those orders. ECF No. 72 at 270; ECF No. 79 at 39–41; ECF No. 81 at 83–84.

In December 2013, Global asked 3E to manufacture packaging for a new product launch. ECF No. 79 at 25–27. 3E provided a sample to Global in May 2014, but the quality was sub-par. *Id.* at 30. Global eventually ordered the packaging from one of its then-current suppliers. *Id.* at 31–32.

In January 2014, Ms. Duan emailed Ms. Kennedy noting that she had sent a sample shirt to 3E so that 3E would manufacture shirts to be worn by Cellairis sales associates. ECF No. 68-

21 at 2; ECF No. 72 at 73.  On February 13, 2014, in response to a request from Ms. Kennedy, Ms.

Duan sent Ms. Kennedy an email providing an estimate of the quantities of each shirt size sought.

ECF No. 68-21 at 1–2.  At the end of the message, Ms. Duan wrote, "Joseph [Brown] would like

to start the new process ASAP.  So we can send the order to [3E] and [3E] send it to our factory.

Can you please let me know when we can start this process?"  *Id.* at 2.  In a draft response sent to

Henry Wang, Ms. Kennedy wrote:

> Please see my proposed response to Susan below . . . .  Let me know if this is
> acceptable or if you want to make any changes.
>
> Hi Susan:
>
> I have spoken at length with both Tommy and Henry about the PO's moving
> forward.
>
> 1)  What we propose is for you to continue to place your orders for existing product
> directly to your factory.  Please send us hard samples and a PO to the factory.  We
> will then work with our factories or your existing suppliers to see if we [can] further
> reduce the cost or provide other improvements.  As Henry discussed when we were
> in Atlanta [for the November 2013 meeting], our goal would be to improve your
> manufacturing, lead-time, or other efficiencies while maintaining or reducing costs.
>
> 2)  We of course would price any new product that you bring to us, with the goal
> of cost and quality savings.

*Id.* at 1.  Henry Wang responded, "I'm fine.  [B]ut it seems she's talki[ng] about the new project?"

to which Ms. Kennedy replied, "I don't think so because she specifically says we would send the

order(s) to THEIR FACTORY.  In the case of the shirts alone, they have no idea who the factory

is—this is our factory.  That is why I think she is referencing the bigger picture."  *Id.*  On February

17, 2014, Ms. Kennedy, with Henry Wang's approval, sent Ms. Duan an email materially identical

to that which she had proposed.  ECF No. 68-28 at 1.

As to the shirt project, 3E was "frustrate[ed]" because Global did not provide enough detail about the sizing of the shirts. ECF No. 72 at 241–42. As Henry Wang noted, the parties "never had a process for new orders. Shirts would be considered a new order, a new product." *Id.* at 267.

In March 2014, Global asked 3E to provide the cardboard insert for the packaging for a particular cell phone case. ECF No. 68–26; ECF No. 79 at 33. When 3E quoted a price of 33 cents per insert, Global noted that the price was more than it was currently paying and asked if 3E could give it a price of 1 cent per unit. ECF No. 68–26 at 1–2; ECF No. 79 at 33–35. Ms. Kennedy of 3E replied, "I'm afraid not." ECF No. 68-26 at 1. There was no further communication from 3E as to the inserts and Global purchased them from a current supplier. ECF No. 79 at 35.

Regarding "the bigger picture" of ordering products that Global was already purchasing from its own suppliers, Ms. Duan left a voicemail for Ms. Kennedy at the beginning of March 2014 asking her when Global could start putting 3E's name on the purchase orders in place of the name of the existing vendor so that the parties could begin the new ordering process. ECF No. 79 at 47–48. Ms. Kennedy referred Ms. Duan back to her February 17, 2014 email, adding, "We need to first figure out our 'value add' on these PO's and at this time don't have enough information to do this. Once we actually see the PO's that you are placing to your existing factory we can research ways to save or maintain your cost." ECF No. 68-28.

In mid-March 2014, Global began copying 3E on purchase orders to Global's existing suppliers. ECF No. 68-38 at 5; ECF No. 68-48; ECF No. 68-49; ECF No. 72 at 93. The purchase orders included information such as the vendor's name and address, unit description including SKUs,[11] number of units ordered, and unit price. ECF No. 68-48. On March 19, 2014, in an email to Henry and Tommy Wang, Ms. Kennedy wrote:

---

[11] "SKU" stands for "stock keeping unit," and is a way of identifying product varieties. *See, e.g.*, *Fed. Trade Comm'n v. H.J. Heinz Co.*, 26 F.3d 708, 712 (D.C. Cir. 2001).

> Are you seeing all these PO's that are coming into "orders." I could spend ½ of every day just processing these small orders and all the correspondence that goes with them.
>
> I am going to add to my spreadsheet the pricing to see if we actually get anything of substance. We have to set a minimum price with them. These small orders would kill us.
>
> We lose money with just the amount of time it takes for me and China Shanghai to read them!

ECF No. 68-31 at 1. She later that day complained again about the size of the orders, asserting that, of 22 purchase orders received in one week, only three were in an amount over $10,000; approximately one week later she calculated that out of 44 purchase orders, only five were in an amount over $10,000. ECF No. 68-2 at 1.

On Friday, March 21, 2014, Ms. Duan emailed Ms. Kennedy to "follow up" regarding a conference call the previous week. ECF No. 68-38 at 6. She asked if the parties could "start the order process" from "next Monday." On April 3, 2014, Ms. Duan emailed Ms. Kennedy stating that it had been "almost two weeks since we had [a] conference call" and that Global had been "copy[ing] [3E] on [its] new order email[s] for 2 weeks." *Id.* at 5. She asked for a date that Global could "start send[ing] order[s] to [3E]." *Id.* In a series of responses on that same day, Ms. Kennedy stated that 3E "ha[d] not received any hard samples of product as requested when we started to receive the orders which makes it impossible for us to determine if our factories can provide value add to the terms," and that 3E could not get "competitive pricing without samples." *Id.* at 4–5. The parties thereafter negotiated a process by which the factories from which Global was ordering products would provide three samples of each product to TMD's Shanghai headquarters. *Id.* at 1–4; ECF No. 72 at 101–02; ECF No. 79 at 65. Also on April 3, Lisa Kennedy emailed Tommy Wang, Henry Wang, and Mr. Tymoczko stating that 3E needed to "set a monetary limit" of $10,000 for the orders 3E was willing to fill. ECF No. 68-36 at 1.

Two weeks later, in an April 17, 2014 email, Ms. Kennedy instructed Global to stop sending "all of [its] orders" to the "orders" email address that Ms. Duan's team had been using, and to begin sending them to a new email address—cellairis@tmdholdings.com—so that "there is no chance of [Global's] order[s] being misdirected or overlooked." ECF No. 68-40. Global did so. ECF No. 79 at 51. According to an August 6, 2014 email from Ms. Kennedy to Tommy Wang, Henry Wang, and Mr. Tymoczko, those purchase orders "went directly to China for follow-up," and Ms. Kennedy was instructed not to monitor or act on them. ECF No. 68-44 at 1. Ultimately, 3E did not fill any orders for Global. ECF No. 79 at 67–68; ECF No. 80 at 41. Moreover, while Global communicated with 3E about devising an ordering process, there is no evidence that Global complained to 3E about a failure to provide product during the period from September 30, 2013, when the parties signed the Manufacturing Agreement, until August 2014.

For its part, 3E found the purchase orders that Global was sending them to be confused and inaccurate, often including what appeared to be incorrect prices or amounts for the product being ordered. ECF No. 72 at 99–100, 292–94. This interfered with 3E's ability to analyze Global's procurement process so that 3E could propose ways to "value add." *Id.* at 291–92, 297–98. There were also timing issues, as many of the purchase orders sought delivery fewer than 30 days after the purchase order was issued, which did not make sense if 3E was to manufacture the products. *Id.* at 98–99. It further made it difficult for 3E to evaluate when it should "jump in" and become the middleman for orders Global was placing with its existing suppliers. *Id.* at 99. Indeed, 3E considered the carbon copy process a strategy to help it "watch and observe what [Global] [was] doing with [its] purchasing and [its] factories" to aid in its function as a consultant aiming to engage in "business process reengineering" for Global. *Id.* at 225–26, 271.

On August 6, 2014, Mr. Skouras and Mr. Brown from Global called Mr. Tymoczko from 3E. ECF No. 81 at 38, 103. The parties discussed Global's frustration with the fact that it was making monthly payments of $25,000 and receiving no product. *Id.* at 39–40. At that point, Global had made seven such payments in the months of December 2013 through June 2014, for a total of $175,000. *Id.* at 40–41. Global had made neither the July payment nor the August payment. *Id.* at 41; ECF No. 68-77 at 1. A follow-up email from Mr. Brown to Mr. Tymoczko explained that Global "did not make the last payment because [it] [was] having issues with getting product made, either through [3E's] own factories or by using [Global's] factories." ECF No. 68-43 at 2. Mr. Brown stated that Global was following the protocol set out by 3E and providing 3E the requested information, but that there had not been "any movement on actual production or invoicing." *Id.* The email stated that "in order for [Global] to continue making payments," 3E needed to begin making product or paying Global's "factory invoices/PO's." *Id.*

On August 18, 2014, counsel for 3E sent Global a notice of default stating that Global had "failed to make payments due on July 2, 2014, and August 2, 2014," and stating that the failure was a breach not only of the Manufacturing Agreement, but also of the Settlement Agreement. ECF No. 68-77 at 1. 3E reserved its rights to "take any action and exercise any rights it may have under the [Manufacturer] Agreement or Settlement [Agreement]" should Global not "promptly cure the[] defaults and breaches" of those agreements. *Id.* at 2.

### D. Litigation

Global failed to cure the alleged default, and 3E filed this action claiming breach of the Manufacturing Agreement on November 21, 2014. ECF No. 1. Specifically, 3E asserted that Global breached the Manufacturing Agreement when, after paying 3E six monthly payments of

$25,000 each from January 2014 to June 2014,[12] Global failed to pay the remaining 30 monthly payments required by that agreement. *Id.* at 4–6. Global filed a counterclaim against 3E for breach of contract and breach of the covenant of good faith and fair dealing.[13] ECF No. 5 at 13. Global's theory was that 3E had breached the Manufacturing Agreement by failing to (1) address Global's orders for products, (2) manufacture products for Global, (3) ensure that another manufacturer could manufacture the products 3E could not, and (4) return the value of the payments that 3E had made as advances on the costs of ordered products. *Id.*

3E then moved to dismiss Global's counterclaims. ECF No. 11-2. It argued, among other things, that, pursuant to Section 2.C of the Manufacturing Agreement, if 3E could not manufacture a product sought by Global, 3E could, but was not required to, procure the product from one of Global's current suppliers:

> [Paragraph 2.C] does not require 3E Mobile to work with or seek out any other manufacturer. On the contrary, . . . if 3E cannot provide a product for any reason, it "**may** arrange to have the Product produced by one of Global's current manufacturers." In their use of "may" (and not "shall") in the Manufacturing Agreement, the parties clearly and unambiguously expressed their intention to create a right and not an obligation. As such, 3E Mobile is permitted, but not required, to source a product with another Global manufacturer.

*Id.* at 10–11 (citations to record omitted). Judge Sullivan roundly rejected that argument:

> 3E insists that the Agreement unambiguously provides that it "may manufacture products for Global, it may have the products produced by another manufacturer, and in the event the products are manufactured, they must be provided to Global within a certain amount of time." 3E's reading of the Agreement is as untenable as it is unreasonable because it allows 3E to collect Global's advance payments absent any obligation to produce any product ordered by Global. Such an agreement is

---

[12] Testimony at the trial established that Global had actually made seven payments totaling $175,000. *See, e.g.*, ECF No. 72 at 175; ECF No. 80 at 55; ECF No. 81 at 39–40.

[13] Global also alleged an alternative count of unjust enrichment against 3E because 3E kept Global's advance payments. ECF No. 5 at 14. Global has since abandoned this claim, stating, "If the Court concludes that the Manufacturing Agreement fails, Global does not press its unjust-enrichment counterclaim, or seek rescission damages due to the Manufacturing Agreement's failure. That is because 3E is a shell entity that has promised to bankrupt itself if Global prevails . . . ." ECF No. 86 at 38 n.7. Somewhat inconsistently, notwithstanding 3E's alleged threat to bankrupt itself, Global still seeks damages for breach of contract.

nonsensical on its face, and unfathomable in a context such as this where the parties expressly anticipated doing nearly $4 million worth of business with each other.

*3E Mobile, LLC v. Glob. Cellular, Inc.*, 121 F. Supp. 3d 106, 110 (D.D.C. 2015) (internal citations omitted). Although he found that 3E's interpretation was unreasonable, he also held that "the terms of the Agreement are ambiguous." *Id.* "A superb example of inartful drafting, the Agreement's ambiguity is expressed by its plain language: 3E cannot be both obligated, in a mandatory sense, to produce products for Global while also having the option to identify alternative manufacturers, if, for 'any reason,' it cannot fulfill Global's orders." *Id.* He therefore held that Global had pleaded a viable counterclaim for breach of contract. *Id.*

In light of the finding that the Manufacturing Agreement was ambiguous, the parties proceeded to engage in discovery. After consenting to the jurisdiction of the undersigned for all purposes (ECF No. 62; Minute Order dated Oct. 20, 2017), the Court heard testimony in a bench trial on March 20, April 19, and April 20, 2018. ECF No. 72; ECF No. 79; ECF No. 80; ECF No. 81. After testimony concluded, the Court issued the following order:

> The Manufacturing Agreement at issue in this case neither defines what constitutes an "order" nor sets a process by which an order must be placed. In their post-trial briefs, the parties should address (1) whether defining an order and an ordering process was material to the parties' agreement and (2) if so, what is the effect of the fact that the agreement does not reflect such definition, to include whether the Manufacturing Agreement, Settlement Agreement, or both, should be deemed void.

Minute Order dated May 4, 2018. The parties then submitted proposed findings of fact and conclusions of law, and the Court heard closing arguments on July 13, 2018. ECF No. 86; ECF No. 87; ECF No. 88; ECF No. 89; Minute Entry dated July 13, 2018.

## IV. LEGAL ANALYSIS

### A. Principles of Pennsylvania Contract Law

As noted, the Manufacturing Agreement includes a provision choosing the law of Pennsylvania to govern disputes regarding that document. ECF No. 68-4, § 20. A federal court exercising diversity jurisdiction, as in this case, "follows the choice-of-law rules of the jurisdiction in which it sits," here, the District of Columbia. *Fawehinmi v. Lincoln Holdings, LLC*, 895 F. Supp. 2d 148, 152 (D.D.C. 2012) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). "District of Columbia courts give effect to contractual choice-of-law provisions 'as long as there is some reasonable relationship with the state specified.'" *Id.* (quoting *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 144, 153–54 n.3 (D.D.C. 2008)). 3E is a Pennsylvania limited liability company, which provides a sufficient relationship to apply that state's law. *See Pierce v. Showell*, 357 F. Supp. 2d 307, 310 (D.D.C. 2005) (finding sufficient contacts to apply Maryland law where one party was citizen of Maryland).

Under Pennsylvania law, a party claiming breach of contract must establish by a preponderance of the evidence "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)); *see also Keys v. Allstate Prop. & Cas. Ins. Co.*, Civil Action No. 15-4253, 2017 WL 495792, at *3 (E.D. Pa. Feb. 7, 2017); *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 977 F. Supp. 2d 462, 467 (E.D. Pa. 2013) (quoting *Guzzi v. Morano*, No. 10-1112, 2013 WL 4042511, at *10 (E.D. Pa. Aug. 8, 2013)). "[T]o determine whether a contract was formed under Pennsylvania law, a court must look to: (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be

enforced; and (3) whether there was consideration." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584 F.3d 513, 533 (3d Cir. 2009). That is, "[e]ven when there is evidence of mutual assent, [an] . . . agreement does not constitute an enforceable contract if there are 'ambiguities and undetermined matters which render [it] . . . impossible to understand and enforce.' To be enforceable, an agreement must be certain about 'the nature and extent of its obligation[s].'" *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194, 202 (3d Cir. 2012) (final alteration in original) (first quoting *Mazzella v. Koken*, 739 A.2d 531, 537 (Pa. 1999), then quoting *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 585 (3d Cir. 2009)). Put another way, "[t]he essential terms must be definite enough to provide a basis for enforcing the agreement." *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 977 F. Supp. 2d 462, 470 (E.D. Pa. 2013) (quoting *Guzzi v. Morano*, Civil Action No. 10-1112, 2013 WL 4042511, at *11 (E.D. Pa. Aug. 8, 2013)). "If a court, due to indefiniteness or incompleteness, is unable to determine if a contract was performed, the court must find no contract existed in the first place." *Id.* (quoting *Guzzi*, 2013 WL 4042511, at *11). Thus, "[i]t is firmly established that a contract is not enforceable unless there is a meeting of the minds on the essential elements of the agreement, and the essential terms of that agreement are certain enough to provide the basis for an appropriate remedy." *Philadelphia Fast Foods, Inc. v. Popeyes Famous Fried Chicken, Inc.*, 647 F. Supp. 216, 232–33 (E.D. Pa. 1986); *see also Brisbin v. Superior Valve Co.*, 398 F.3d 279, 293 (3d Cir. 2005) ("[T]o be enforceable, a contract must . . . represent a meeting of the parties' minds on the essential terms of their agreement" (second alteration in original) (quoting *Yellow Run Coal Co. v. Alma–Elly–Yv Mines, Ltd.*, 426 A.2d 1152, 1154 (Pa. Super. Ct. 1981))).

## B. The Manufacturing Agreement is the Only Relevant Agreement

As noted, 3E's original interpretation of the Manufacturing Agreement, put forward in its motion to dismiss Global's counterclaim, was that Global was required to pay $780,000 to 3E but 3E was not obligated to manufacture or otherwise produce anything for Global in return. Here 3E mounts a related, but different, argument. 3E contends that the contract at issue comprises both the Settlement Agreement and the Manufacturing Agreement. ECF No. 87 at 4, 7. The purpose of that (consolidated) contract, it says, was to settle the Crystal Icing copyright action by requiring Global to pay a total of $880,000 to 3E ($100,000 through the Settlement Agreement and $780,000 through the Manufacturing Agreement), in return for which 3E would dismiss the action. *Id.* at 4, 17. 3E also agreed that if Global placed orders with 3E to manufacture goods, and 3E was able to manufacture those goods, Global's advance payments would function as a credit of 20% on the amount Global owed to 3E for its orders. *Id.* at 4, 12–13, 25. If, however, 3E was unable to manufacture the product "for any reason," 3E asserts that it was not obligated to provide anything to Global, because its consideration for Global's promise to pay under the Manufacturing Agreement was the dismissal of the Crystal Icing litigation. *Id.* at 4–5, 8, 13–14, 17. Rather, 3E contends that it had "an optional right" that was "not part of the Settlement or Manufacturing Agreement": it could "try to take over orders [from Global's suppliers] to try to find value." *Id.* at 14. Thus, 3E's interpretation rests on two premises—first, that the Settlement Agreement and the Manufacturing Agreement are not separate contracts, but are part of the same agreement; and second, that a primary purpose of that consolidated agreement was to funnel a total of $880,000— the majority of that amount ($780,000) via the provisions of the Manufacturing Agreement—from Global to 3E as part of Global's payment to settle the Crystal Icing case. ECF No. 87 at 4–5, 13–14, 17.

It is 3E's burden to establish the documents that constitute the parties' agreement. *See, e.g., Roberts Tech. Grp., Inc. v. Curwood*, Civil Action No. 14-5677, 2015 WL 5584498, at *4 n.5 (E.D. Pa. Sept. 23, 2015) (noting question about whether multiple documents constituted single agreement and stating that the plaintiff "will ultimately bear the burden of proof at trial to show the existence of an enforceable agreement"). Its argument fails at the first step. To be sure, there is conflicting evidence on the issue of whether the parties intended the Settlement Agreement and the Manufacturing Agreement to constitute a single agreement. The two agreements were negotiated at the same time, resulting in a single term sheet.[14] Moreover, the Settlement Agreement explicitly references the Manufacturing Agreement: after the provisions requiring the filing of a stipulation dismissing the Crystal Icing action and Global's subsequent payment of $100,000, the document includes a provision stating that "3E Mobile and Global will enter into a manufacturing agreement . . . in the form attached as Exhibit B"[15] (ECF No. 68-5, §§ 3–4, 7), which can be evidence that the documents were intended to be part of the same agreement, *see,*

---

[14] 3E's focus on the provisions of the Term Sheet that the parties hammered out at the mediation in June 2013 is curious. At one point in its Proposed Findings of Fact and Conclusions of Law, 3E appears to argue that the Manufacturing Agreement and the Settlement Agreement are merely subsidiary to the Term Sheet in setting out the terms of the parties' contract:

> As detailed in the comprehensive Settlement Term Sheet . . . a comprehensive manufacturing agreement . . . was to be entered into between Global and 3E, with the primary terms established in the Settlement Term Sheet. *The two additional documents, the Manufacturing Agreement and the Settlement Agreement, were incorporated into the Settlement Term Sheet with the primary terms laid out thereto,* was ultimately entered into between the parties on September 30, 2013.

ECF No. 87 at 4 (emphasis added) (citations to record omitted). However, as laid out above, both the Settlement Agreement and the Manufacturing Agreement have integration clauses. The Term Sheet, as an earlier and preliminary outline of the parties' agreement, ceased to have legal significance when the other two agreements were executed. Even if one or both of the later, integrated agreements are non-binding or void, the Term Sheet cannot be used to contradict or change the terms of those subsequent agreements. *See Alphonse Hotel Corp. v. Tran*, No. 13 Civ. 7859, 2014 WL 380130, at *8 (S.D.N.Y. Aug. 1, 2014) (applying Pennsylvania law and holding that "a written and integrated contract does not have to be enforceable to bar the terms of prior inconsistent agreements if the circumstances demonstrate that the parties intended the integrated contract to displace prior agreements"), *aff'd* 828 F.3d 146 (2d Cir. 2016).

[15] As noted above, the copy of the Settlement Agreement entered into evidence at trial does not include any attachments. ECF No. 68-5.

*e.g.*, *Huegel v. Mifflin Constr. Co.*, 796 A.2d 350, 357 (Pa. Super. Ct. 2002). The Settlement Agreement further permits 3E to disclose to "entities and persons against which 3E Mobile is considering asserting rights under its copyrights" that the parties resolved the Crystal Icing litigation "by entering into a multi-million dollar manufacturing agreement." ECF No. 68-5, § 5. Finally, Tommy Wang's testimony indicates that 3E would not have entered into the Settlement Agreement if not for the Manufacturing Agreement, stating that 3E would not have settled the Crystal Icing litigation for only $100,000. ECF No. 72 at 63, 110.

However, there is also evidence indicating that the parties intended the agreements to be interpreted separately. Although the Settlement Agreement refers to the Manufacturing Agreement, the reference is fleeting, stating only that 3E and Global will enter the Manufacturing Agreement but not explicitly incorporating its terms into the Settlement Agreement. ECF No. 68-5, § 7. Mere mention in one agreement of another agreement "is not sufficient to incorporate all of the terms of th[e] ancillary agreement" into the other agreement. *Claret Capital Nominees v. Benett*, Civil Action No. 09-cv-3532, 2009 WL 4362821, at *8 (E.D. Pa. Nov. 30, 2009). The Manufacturing Agreement includes an integration provision stating that it is "the entire Agreement between Global and [3E] regarding the Approval [of 3E as a manufacturer]." ECF No. 68-4, § 23. Similarly, the Settlement Agreement asserts that it is "the entire agreement between the Parties with respect to the Subject matter hereof." ECF No. 68-5, § 16. Although not dispositive on the issue, "[a]n integration clause stating the parties mean the writing to represent their entire agreement is a 'clear sign' the writing represents the entire agreement" between the parties as to the subject matter of that agreement. *Solar Innovations, Inc., v. Plevyak*, No. 1110 MDA 2012, 2013 WL 11272849, at *6 (Pa. Super. Ct. Mar. 20, 2013). Moreover, the textbook situation in which disparate documents should be construed together arises when one agreement cannot be

understood without recourse to another agreement. *See, e.g. Neville v. Scott*, 127 A.2d 755, 757 (Pa. Super. Ct. 1975) ("Without the information supplied by the earlier contract, the later agreement is incomplete."). Here, the Manufacturing Agreement appears, on its face, to constitute the whole of the agreement between 3E and Global as to their future business relationship; the Settlement Agreement, on the other hand appears to constitute a complete agreement to end the prior litigation begun by Crystal Icing. Each agreement, that it is, "stands on its own terms." *Lenzi v. Hahnemann Univ.*, 664 A.2d 1375, 1380 (Pa. 1995) (stating that a court may construe two contracts together "to represent a complete transaction" only if "one contract does not provide for a complete representation of the intent of the parties," and not where the contracts "stand[] on [their] own terms").

In addition, the Manufacturing Agreement contains a choice-of-law and choice-of-venue provision that is missing from the Settlement Agreement. Under the Manufacturing Agreement, the parties consented to the jurisdiction of this Court and the application of Pennsylvania law. ECF No. 68-4 at 16–17. The Settlement Agreement contains no such provision. ECF No. 68-5. That means that litigation regarding the Settlement Agreement would have to be brought in an appropriate court pursuant to the general venue provision of 28 U.S.C. § 1391, which lays venue for a civil action in "the judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located" or in the district "in which a substantial part of the events or omission giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated." Global is a Georgia corporation, and the Settlement Agreement was negotiated largely in the Western District of New York to end litigation brought in that district. Thus, it does not appear that venue would be proper in this Court for litigation

pursuant to the Settlement Agreement, whereas this Court is the only proper venue for litigation pursuant to the Manufacturing Agreement.

The choice-of-law issue confirms that parties did not intend the two documents to be interpreted as a single agreement. The two agreements are likely governed by different law—Pennsylvania law for the Manufacturing Agreement and, as the Settlement Agreement was largely negotiated in the Western District of New York and settles litigation that was brought in that district, New York law for the Settlement Agreement.[16] To be sure, courts can and regularly do apply the law of different jurisdictions to different claims. *Mattiaccio v. DHA Grp., Inc.*, 20 F. Supp. 3d 220, 228 (D.D.C. 2014) (A choice of law analysis must be "performed for each issue adjudicated, therefore a different law can apply to different issues."). However, it would be inefficient, if not irrational, to enter into a single agreement memorialized in two documents where a different state's laws governed each. *See, e.g.*, *Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148, 1154 (Ca. 1992) ("We seriously doubt that any rational businessperson, attempting to provide by contract for an efficient and businesslike resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship."). And here, as it is clear that the parties knew how to choose a particular state's law to govern a contract (as they did in the Manufacturing Agreement), there is nothing to indicate that the parties expected the law of Pennsylvania to apply to the Settlement Agreement. *See, e.g.*, *Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1, 8

---

[16] If litigation regarding the Settlement Agreement were brought in New York, that state's "center of gravity" choice-of-law analysis, which looks at "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties," *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 238 (S.D.N.Y. 2013), would likely result in application of New York law. If Georgia were the venue, Georgia's *lex loci contractus* choice-of-law analysis, in which "contracts are 'governed as to their nature, validity and interpretation by the law of the place where they were made' unless the contract is to be performed in a state other than that in which it was made," *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998) (quoting *General Tel. Co. v. Trimm*, 311 S.E.2d 460, 461 (Ga. 1984)), would also likely lead to application of New York law.

(D.D.C. 2016) (holding that a clause from one agreement may be integrated into a second related agreement only when the language of the first agreement explicitly incorporates that clause); *cf. Toll v. Tanenbaum*, 656 F. App'x 108, 114 (3d Cir. 2014) (applying New York law to an agreement without a choice-of-law-provision because numerous previous contracts were governed by New York law without objection from either party).

Additionally, the Court credits the testimony of Mr. Skouras and Mr. Brown of Global that the Manufacturing Agreement and Settlement Agreement were "separate" and "standalone" contracts. ECF No. 80 at 85–86; ECF No. 81 at 14, 123. Indeed, Mr. Skouras testified that Global agreed to settle the case for a low-end approximation of the cost of defending the case—$100,000. ECF No. 81 at 11–12. There is no indication that Global would have settled the Crystal Icing case for an amount over eight times that amount, which represents that total payments Global would make to 3E under the Settlement Agreement and Manufacturing Agreement. Nor is it credible that when 3E acquired Crystal Icing for a $10,000 cash payment and assumption of $50,000 in lease obligations (ECF No. 72 at 19, 197) it was gaining a lawsuit worth almost $1,000,000. In short, 3E's argument that the two agreements were a means to funnel $880,000 to Global to settle the Crystal Icing litigation is not plausible. Therefore, the Settlement Agreement is not part of the contract at issue in this case.

### C. The Manufacturing Agreement Requires 3E Either to Manufacture Products for Global or to Source Products from Global's Manufacturers

That the Manufacturing Agreement is a standalone document has consequences for its interpretation. Specifically, it exposes as fatally flawed 3E's construction that the document did not obligate it to manufacture or source products Global ordered, but that it could do so if it chose to. Witnesses from both parties—Harry Wang and Tommy Wang from 3E and Taki Skouras from Global—testified that manufacturing and sourcing were the two options included in the

Manufacturing Agreement. ECF No. 72 at 70, 262; ECF No. 80 at 51; ECF No. 81 at 31–32, 49–50. If the Manufacturing Agreement did not require 3E to provide products to Global through either of those methods, then it required nothing of 3E, at all. "'Words of promise which by their terms make performance entirely optional with the "promisor" whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise.' Rather, if the provisions of a contract are optional with the promisor, the contract is termed 'illusory' . . . ." *Starr v. O-I Brockway Glass, Inc.*, 637 A.2d 1371, 1373 n.2 (Pa. Super. Ct. 1994) (quoting Restatement (Second) of Contracts § 2 comm. e (1981)); *see also Lackner v. Glosser*, 892 A.2d 21, 31 (Pa. Super. Ct. 2006) ("If the promise is entirely optional with the promisor, it is illusory, lacks consideration, and is unenforceable."). Therefore, if that were a proper interpretation of the Manufacturing Agreement, the agreement would be unenforceable. *See, e.g.*, *Geisinger Clinic v. Di Cuccio*, 606 A.2d 509, 512 (Pa. Super. Ct. 1992) ("If a mutuality of promises is absent, the contract is unenforceable."). In his decision on 3E's motion to dismiss Global's counterclaim, Judge Sullivan found such an interpretation "nonsensical on its face, and unfathomable in a context such as this where the parties expressly anticipated doing nearly $4 million worth of business with each other." *3E Mobile*, 121 F. Supp. 3d at 110. The evidence at trial has not undermined Judge Sullivan's conclusion, and the Court adopts it here.[17] As that construction is no longer tenable, the only reasonable interpretation of the Manufacturing Agreement is that it required 3E to

---

[17] Judge Sullivan's conclusion does not constitute law of the case. The law-of-the-case doctrine states that "the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*." *Lashawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc). The issue Judge Sullivan decided was whether Global had sufficiently pleaded a breach of contract claim against 3E. *3E Mobile*, 121 F. Supp. 3d at 110. Not only was his decision denying the motion to dismiss an interlocutory order and therefore "not subject to law of the case doctrine and . . . always [available to] be reconsidered prior to final judgment," *Margolis v. U-Haul Int'l, Inc.*, 818 F. Supp. 2d 91, 99 (D.D.C. 2011) (quoting *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997)), but also "because the record before the . . . court [here] differ[s] materially from the [counterclaim], the law of the case does not apply," *Acosta v. Nelson*, 561 F. App'x 4, 6 (D.C. Cir. 2014). Rather, the Court here "[is] not deciding the '*same* issue'" as did Judge Sullivan. *Id.* (quoting *Lashawn A.*, 87 F.3d at 1393).

manufacture products that 3E provided to it or, if it could not—for any reason—to source those products from Global's then-current manufacturers on terms that were the same or better than Global received from those other manufacturers.

**D.     The Manufacturing Agreement Fails to Include Essential Terms**

Resolution of this case would seem to depend on answering two simple questions: did Global order products from 3E and, if so, did 3E fill those orders.  If Global placed orders and 3E failed to fill them, 3E will have failed to perform, thus barring its breach of contract claim but establishing Global's.  *See, e.g.*, *McCausland v. Wagner*, 78 A.3d 1093, 1101 (Pa. Super. Ct. 2013) ("If a breach constitutes a material failure of performance, the non-breaching party is relieved from any obligation to perform; thus, a party who has materially breached a contract may not insist upon performance of the contract by the non-breaching party." (citing *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009))).  Conversely, if Global did not place orders, 3E had nothing to fill and Global breached by failing to continue to pay 3E.  However, the situation is a bit more complex—or, looked at in a different way, even simpler—than that.  The claims turn on whether orders were placed, but nothing in the Manufacturing Agreement or the circumstances surrounding the parties' relationship sufficiently defines how to determine the answer to that question.  The Court is thus "unable to determine if [the Manufacturing Agreement] was performed," and so "must find no contract existed in the first place."  *TruePosition*, 977 F. Supp. 2d at 470.

1.     An "Order" and/or an "Ordering Process" were Essential to the Manufacturing Agreement

The Manufacturing Agreement, by its terms, "contemplate[s]" that during its three-year term, "Global shall purchase a minimum of three million nine hundred thousand dollars" in products from 3E.  ECF No. 68-4, §§ 4.A & 12.  Tommy Wang, Harry Wang, and Mr. Tymoczko

from 3E and Mr. Skouras and Mr. Brown from Global all confirmed at trial that the purpose of the Manufacturing Agreement was to create a relationship in which Global would purchase at least $3.9 million of products from 3E. ECF No. 72 at 40, 47, 181, 213; ECF No. 80 at 30–31, 69; ECF No. 81 at 6, 121, 134. Harry Wang explicitly confirmed what is obvious: that, in order for Global to become a customer of 3E, it "would need to order products from 3E." ECF No. 80 at 30–31. The evidence is thus clear that an ordering process was essential to the Manufacturing Agreement. Appropriately, neither party argues otherwise.[18]

> 2. The Manufacturing Agreement does not Define the Terms "Order" or "Ordering Process"

It is clear that the Manufacturing Agreement does not explicitly define the terms "order" or "ordering process." The word "order" is used a few times in relation to Global's purchase of goods from 3E, but never developed. ECF No. 68-4, §§ 2.E ("3E guarantees that all Products provided to Global in response to any order by Global hereunder will be at least of the same quality as is currently provided by Global's manufacturers . . . ."); 2.F ("Once the order is complete, then [3E] shall perform a final inspection prior to the Product being shipped to Global or its designee . . . ."); 2.J ("All purchase orders must be shipped in full, unless otherwise agreed to between the parties in writing."); 4.D ("The advance payments referenced in Section 4.B and 4.C above, will be held by [3E] as a credit for use by Global in the event that Global places an order (or orders) for Product . . . ."); 4E ("Global can place orders with [3E] at any time during the Term."). While

---

[18] In its proposed findings of fact and conclusions of law, 3E includes a heading that states, "Global Placed No Orders with 3E and the Lack of a Definition of an Order in the Settlement and Manufacturing Agreement is Not Material." ECF No. 87 at 8. The argument that follows that heading, however, does not address the question of materiality, but rather argues that Global never made an order, however that term is defined. Then, in 3E's response to Global's proposed findings of fact and conclusions of law, 3E categorically states that "sending orders to [3E] was a necessary part of the contract." ECF No. 88 at 5. That admission is well-taken.

these provisions obviously contemplate that there will be orders, they do not explain how those orders are to be accomplished.

In attempting to find an outline of the ordering process in the text of the Manufacturing Agreement, 3E focuses on Section 2.E. That section states, "Once a sample has been approved under Section 2.C or 2.D, then prior to the manufacturing process, [3E] will send Global a written document (e-mail is acceptable) indicating the final specifications for the Product."[19] ECF No. 68-4, § 2.E; ECF No. 87 at 9. 3E asserts that "[u]pon approval being given, production could begin, whereby 3E would have the products produced and delivered to Global." ECF No. 87 at 9. But that is no answer, at all. None of the cited sections define how an order is to be made.

Moreover, as Global points out, it cannot be accurate to state that any ordering process begins with the approval scheme outlined in Section 2.C. To be sure, that process—which involves Global "provid[ing] [3E] a Product to manufacture," 3E creating a mold, producing a sample, and providing it to Global for approval (ECF No. 68-4, § 2.C)—starts a procedure to be used for products requiring a mold, but even in that situation the ordering process is unclear. The Manufacturing Agreement does not dictate the manner in which a product must be "provide[d]" to 3E to kick off the approval process. As Tommy Wang testified, "providing" a product could mean many different things, such as submitting a sample, supplying a drawing, or just sending an email. ECF No. 72 at 169. Where there is such imprecision at the first step of what 3E indicates is an ordering process, the procedure cannot be said to have been meaningfully defined.

Additionally, that approval process, by its terms, applies only to products that are produced using a mold. None of the products that Global specifically asked 3E to manufacture—what

---

[19] Section 2.C is the section, quoted above, that lays out 3E's two options for providing products to Global. Section 2.D governs the situation where 3E identifies a product it thinks Global might want to purchase and discusses how the parties will go about determining whether 3E should manufacture that product.

Global calls its "direct product requests" for packaging materials and t-shirts (ECF No. 86 at 31–35)—required the use of a mold. For non-molded products, 3E points to nothing in the text of the Manufacturing Agreement that outlines an ordering process. Further, as 3E was admittedly not primarily a manufacturer (ECF No. 72 at 129), the number of products that would be subject to the Section 2.C approval process—which 3E asserts was the beginning of the ordering process—was vanishingly small.[20] Finally, the Manufacturing Agreement gave 3E the option, "for any reason" and at any time, to source products from Global's existing manufacturers rather than to manufacture the products itself. ECF No. 68-4, § 2.C. Indeed, the Manufacturing Agreement appears to allow 3E to choose not to manufacture a product requested by Global prior to engaging in the approval procedure of Section 2.C. But the Manufacturing Agreement is silent as to the process by which Global would make such orders to 3E. In short, 3E's suggestion that the Manufacturing Agreement itself defines an ordering process is untenable.

3. Industry Custom Does Not Supply the Definition of an Order or an Ordering Process

3E's real point appears to be that the issuance of a "purchase order . . . is when the full terms of the order are placed and the parties have engaged each other for [the] manufacturing process. . . . The order itself is an industry accepted term and well understood by both parties." ECF No. 87 at 11. That is, 3E contends that industry practice can supply the missing term of the Manufacturing Agreement. That is incorrect both as a legal and as a factual matter.

It is well established that "[t]here must be a meeting of the parties' minds on the essential elements of their agreement." *Gnames Advantage, L.P. v. CPC Assocs., Inc.*, No. 00-CV-4032,

---

[20] There is not significant evidence that 3E was capable of manufacturing molds. It appears that when 3E purchased Crystal Icing, it assumed the lease for what Tommy Wang called "some kind of copier/printer" that could "print[] cell phone covers." ECF No. 72 at 197–98. However, the evidence shows that, although Global twice inquired as to whether 3E could produce molded products, nothing came of those requests. ECF No. 79 at 16–19, 36–37.

2002 WL 31750209, at *3 (E. D. Pa. Nov. 22, 2002) (citing *Courier Times, Inc. v. United Feature Syndicate, Inc.*, 445 A.2d 1288, 1295 (Pa. Super. Ct. 1982)). Generally, a court may not provide missing essential terms in an agreement.[21] *See, e.g.*, *Sloan v. Frascella*, No. CIV.A. 12-3609, 2013 WL 4433366, at *3 (E.D. Pa. Aug. 16, 2013) ("[C]ourts, as a matter of law, may not provide a reasonable term where an essential term is left open."); *Quinn v. Traditions of Am.*, Civil Action No. 10-2462, 2010 WL 3239325, at *3 (E.D. Pa. Aug. 16, 2010) ("Though a court may insert incidental terms in an agreement, it will not fashion an agreement for the parties when they have not agreed on essential terms."); *Morris v. Ace Medical Co.*, No. CIV. A. 95-1271, 1996 WL 69400, at *6 (E.D. Pa. Feb. 16, 1996) ("The court may only provide reasonable terms for missing or vague nonessential terms . . . ."), *aff'd*, 96 F.3d 1433 (3d Cir. 1996); *SDK Investments, Inc. v. Ott*, No. CIV. A. 94-1111, 1996 WL 69402, at *8 (E.D. Pa. Feb. 15, 1996) (courts "must resist [contractual] gap-filling . . . since no one but the parties [can] write the missing terms" in an putative agreement). "[I]ndustry custom," therefore, cannot "substitute for mutual agreement by the parties on all essential terms of the contract." *Gnames Advantage*, 2002 WL 31750209, at *3.

Even if the Court could imply a term based on customary ordering procedures in the industry, 3E has failed to prove that ordering via purchase order is the industry standard. Tommy Wang testified that different companies have different procedures for ordering products and admitted that 3E fulfilled orders without receiving purchase orders, particularly when the customer

---

[21] To be sure, the Pennsylvania Supreme Court has stated in dicta that, "[d]epending on the evidence, . . . the court may find it necessary to supply a term which is reasonable under the circumstances to rectify the parties' omission." *Banks Eng'g Co. v. Polons*, 752 A.2d 638, 644 n.4 (Pa. 2000). However, that rule applies only in the "narrow circumstances" in which implying a term "is necessary to prevent injustice and it is abundantly clear that the parties intended to be bound by such a term." *Getty Petroleum Marketing, Inc. v. Shipley Fuels marketing, LLC*, No. 07-CV-340, 2007 WL 2844872, at *14 (E.D. Pa. Sept. 27, 2007) (quoting *Solomon v. U.S. Healthcare Syst. of Pa.*, 797 A.2d 346, 350 (Pa. Super. Ct. 2002)), *aff'd*, 293 F. App'x 166 (3d Cir. 2008); *see also Morris*, 1996 WL 69400, at *6 ("The court may only provide reasonable terms for missing or vague nonessential terms where the intentions of the parties may be clearly discerned from the other express terms of the contract itself."). As discussed below in Section III.D.4, the facts of this case make it obvious that the parties did not come to an agreement as to the process through which Global would order products from 3E.

ordered the same products repeatedly, as Global would have.  ECF No. 72 at 136, 138–39.  Ms. Duan, Global's Procurement and Logistics Manager, testified that ordering products is a multi-step process, beginning with an email from Global to the manufacturer identifying the desired product, continuing through a sampling process, and ending up with a purchasing order for accounting and payment purposes.  ECF No. 79 at 99–100.  Indeed, she analogized the ordering process to ordering a sandwich from Subway:

> [Y]ou tell the person who [is] working at Subway, Hey, I want a sandwich.  Like, I tell them I want something.  That's starting the ordering process, and then I will say, Okay.  I want half; and then I want ham; I want Italian bun; I want this cheese; I want this; I want this; and then they will come out with something and give it to you and I go to the cashier to pay.  That's receipt; kind of, [a] commercial document for the payment.  So [the] order process start[s] at the time that I send [an] email to [the] factory and tell them, Hey, I want this.

*Id.* at 107–08.  Certainly, that testimony describes a multi-step ordering process, but it fails to identify the point at which an order is actually placed—that is, which step of that process triggers 3E's binding obligations under the Manufacturing Agreement.  Certainly, there is no evidence in the record that establishes a standard practice for ordering products from a company that, like 3E, was largely to act merely as a middleman between Global and its suppliers.

Finally, and perhaps most damaging for 3E's contention that the parties "well understood" the ordering process, at the beginning of the relationship, Mr. Skouras of Global emailed Mr. Tymoczko of 3E to schedule a conference call to "nail the ordering process down."  ECF No. 68-17.  That culminated in a meeting in which 3E asserted that it would come up with a system for Global to order products from 3E.  ECF No. 79 at 37–38.  Such conversations and proposals would have been unnecessary if, as 3E argues, both parties understood the ordering process.  Moreover, between January 2013 and April 2014, personnel at both companies attempted to develop an ordering process that would work, including the practice in which Global copied 3E on its purchase

orders to its existing suppliers. ECF No. 68-38 at 5; ECF No. 68-48; ECF No. 68-49; ECF No. 72 at 93. None of this, however, resulted in 3E fulfilling any orders for Global. 3E's argument that industry practice established an ordering process that the parties to the agreement understood therefore fails.

4.     The Parties' Course of Performance does not Establish an Ordering Process

If an agreement is silent as to a particular term, Pennsylvania law permits a court to look to the parties' course of dealing or course of performance to "supplement or qualify the terms of the parties' agreement as well as provide interpretive guidance on terms explicit in that agreement."[22] *Waterford Mortg. Co. v. Integrated Alarm Servs. Grp., Inc.*, No. CIV.A. 06-3967, 2008 WL 4589630, at *3 (E.D. Pa. Oct. 14, 2008) (citing *James v. Zurich-Am. Ins. Co. of Ill.*, 203 F.3d 250, 255-56 (3d Cir. 2000). As the Pennsylvania Supreme Court has noted, "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." *Atl. Richfield Co. v. Razumic*, 390 A.2d 736, 741 (Pa. 1978) (quoting Restatement (Second) of Contracts, § 228, comment g (Tent. Draft No. 5, 1970), now codified at Restatement (Second) of Contracts, § 202 (1981)). "Ordinarily, a 'course of dealing' or 'course of performance' analysis focuses on the actions of the parties with respect to a particular issue." *Step-Saver Data Sys.*, 939 F.2d at 103. However, as with industry practice, discussed above, "'prior dealings' cannot substitute for mutual agreement by the parties on [the] essential terms of the contract." *Waterford Mortg. Co.*, 2008 WL 4589630, at *3 (quoting *Gnames Advantage*, 2002 WL 31750209, at *3).

---

[22] "A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 104 n.40 (3d Cir. 1991) (quoting U.C.C. § 1-205). A "course of performance," on the other hand, "refers to actions with respect to the contract taken after the contract has formed." *Id.* (citing U.C.C. § 2-208(1)).

Here, the parties have no established course of dealing. The Manufacturing Agreement inaugurated the business relationship between the parties, so there is no previous conduct between the them that could have "establish[ed] a common basis of understanding for interpret[ation]." *Id.* at 104 n.40. And the parties' course of performance under the Manufacturing Agreement does not provide any basis on which the Court could find that the parties understood the process by which Global would order products from 3E; indeed, the parties' conduct after the entering into the Manufacturing Agreement shows precisely the opposite.

As outlined above, there was confusion about the ordering process from the outset of the parties' business relationship. Global communicated via email with 3E inquiring about molds for cell phone cases in October 2013, but that request did not result in 3E providing the products for Global—apparently without any complaint from Global to 3E. ECF No. 79 at 16–19, 36–37. In November, the parties attempted to "nail down" the ordering process. ECF No. 68-17; ECF No. 79 at 36–38; ECF No. 80 at 79. Throughout the beginning of 2014, the parties were discussing a "new process" for orders. ECF No. 68-21 at 1–2. In March 2014, Ms. Duan asked Ms. Kennedy of 3E when Global could start the new ordering process by putting 3E's name on purchase orders. ECF No. 79 at 47–48. The "carbon copy" process started in mid-March but did not result in 3E filling any orders for Global. ECF No. 68-38 at 5; ECF No. 68-48; ECF No. 68-49; ECF No. 72 at 93. Rather, Ms. Duan continued to inquire in March and April as to an ordering process. ECF No. 68-36 at 5–6. In April 2014, another procedure was set up in which Global sent purchase orders to a dedicated email address so that 3E would not "overlook[]" them. ECF No. 68-40.

Meanwhile, it is not clear that 3E saw any of those processes as a method through which Global would order products from 3E pursuant to the Manufacturing Agreement. For example, in March 2014, Ms. Kennedy complained to Henry and Tommy Wang that many of the purchase

orders that Global was forwarding to 3E were too small to be profitable for 3E to fill. ECF No. 68-31 at 1; ECF No. 68-2 at 1. She later suggested that 3E impose a floor of $10,000 for orders that 3E was willing to fill. ECF No. 68-36 at 1. Further, Tommy Wang's testimony clearly established that he did not think that the purchase orders that 3E was copied on constituted orders for product from 3E. To him, that process facilitated 3E's information-gathering so that it could "jump[] in and be the new middleman." ECF No. 72 at 99. Henry Wang considered the carbon copy mechanism a way to observe Global's business so that 3E could add value and "reengineer" Global's "business process." *Id.* at 226, 271. For its part, Global failed to complain to 3E that it had not received the products it sought. For example, the record is devoid of emails or other communications from Global to 3E asking why its products had not been delivered. Rather, the evidence shows that the parties were still attempting to work out procedure for ordering products when 3E sent its notice of default, beginning the process that would culminate in this litigation. Thus, it is clear from the parties' conduct that Global and 3E had not developed a system by which Global could reliably order products from 3E pursuant to the Manufacturing Agreement. Their course of performance therefore does not allow the Court to supplement that document with an essential term defining an ordering process.

### E.    The Manufacturing Agreement is Void and Unenforceable

In denying 3E's motion to dismiss Global's counterclaims, Judge Sullivan observed that purpose of the Manufacturing Agreement was to establish a business relationship in which 3E would "produce . . . product[s] ordered by Global." *3E Mobile*, 121 F. Supp. 3d at 110. And yet the document fails to include any explicit directions as to how Global was to trigger 3E's obligation to manufacture or source the products Global sought. The parties' conduct after the document was signed demonstrates not only that the parties failed to agree on that question, but also that neither

had a clear idea of how that process would work going forward. It appears that they left that basic mechanism to be worked out later, after they had seemingly entered into a contract. That is no contract.

This is not to say that a contract for the manufacture or sourcing of goods must always include an explicit process for ordering those goods. Sometimes, that process will be obvious from other provisions of the agreement or even from the parties' prior conduct or course of performance. Here, however, beyond the fact that the parties were strangers prior to the Manufacturing Agreement, the Manufacturing Agreement itself is not a conventional one in which, for example, Party A gives notice to Party B of the products it seeks; Party B provides those products to Party A; and Party A then pays Party B for those products. Instead, the Manufacturing Agreement created a relationship in which Global made payments to 3E prior to having made any orders and to be used as credit against those contemplated orders and 3E accepted those payments with an ill-defined notion of what triggered its obligations. Moreover, the document upon which the parties based their association is itself so poorly drafted as to be nearly "nonsensical." *3E Mobile*, 121 F. Supp. 3d at 110. The relationship, such as it was, unsurprisingly collapsed.

Under Pennsylvania law, a contract is void for indefiniteness where "ambiguities and undetermined matters . . . render [it] . . . impossible to understand and enforce." *Shell's Disposal & Recycling, Inc.*, 504 F. App'x at 202. As noted above, to succeed on its breach of contract claim, 3E would have to show that it performed under the Manufacture Agreement by manufacturing or sourcing products ordered by Global and that Global failed to perform by suspending its monthly payments to 3E. Conversely, for Global to succeed on its breach of contract claim, it would have to show that 3E failed to fulfill orders placed by Global, thus excusing Global's withholding of further monthly payments after June 2014. *See, e.g.*, *McCausland*, 78 A.3d at 1101 ("If a breach

constitutes a material failure of performance, the non-breaching party is relieved from any obligation to perform; thus, a party who has materially breached a contract may not insist upon performance of the contract by the non-breaching party.").  Here, it is impossible to determine from the evidence whether the parties understood Global to have ordered products from 3E Mobile, which was an essential part of the parties' putative agreement.  More to the point, the Court cannot determine from the language of the Manufacturing Agreement or the parties' conduct whether or when an order was made and therefore cannot determine whether or when any breach occurred.  *See, e.g.*, *TruePosition*, 977 F. Supp. 2d at 470 (when a court is "unable to determine if a contract was performed" it "must find no contract existed in the first place."); *Sloan*, 2013 WL 4433366, at *3–4 (finding contract void for indefiniteness where the contract was not sufficiently certain to determine if there had been a breach).  The only conclusion here is that the Manufacturing Agreement is void for indefiniteness.

Because the Manufacturing Agreement is void, it is unenforceable.  *Reynolds v. Univ. of Pennsylvania*, 747 F. Supp. 2d 522, 543 (E.D. Pa. 2010), *aff'd*, 483 F. App'x 726 (3d Cir. 2012) "Where contractual terms are indefinite, the contract is unenforceable.").  Consequently, neither party is bound to perform under the Manufacturing Agreement and neither party can "enforce it in an action at law for damages."  *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956); *see also Mazzella*, 739 A.2d at 538.  Thus, both parties' claims for breach of contract must fail.[23]  Nevertheless, a person who has rendered performance under a contract that is void for

---

[23] With its counterclaim for breach of contract, Global bundled a cause of action for breach of the implied duty of good faith and fair dealing.  ECF No. 5 at 13.  It is not clear that Pennsylvania recognizes a separate cause of action for breach of the duty of good faith and fair dealing in these circumstances.  *See, e.g.*, *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000) (noting that "the courts have recognized an independent cause of action for breach of a duty of good faith and fair dealing only in very limited circumstances," such as "insurers' dealings with insureds, franchisor's dealing with franchisees and other narrow situations").  In any case, "[a]lthough there is some difference of opinion with regard to whether every contract gives rise to an independent cause of action for breach of the implied duty of good faith and fair dealing, there is no dispute that such an action relies on the existence of a valid contract.  In other words, unenforceable contracts do not have enforceable implied terms."

indefiniteness "has a claim in restitution against the recipient as necessary to prevent unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 31 (2011); *see also Cosby v. Am. Media, Inc.*, 197 F. Supp. 3d 735, 745 (E.D. Pa. 2016) ("[I]f a contract is unenforceable in whole or in part . . . unjust enrichment may apply."); *Shulman v. Cont'l Bank*, 513 F. Supp. 979, 986 (E.D. Pa. 1981) ("[I]f an agreement is unenforceable, in some circumstances a party may be entitled to restitution from another who has been unjustly enriched at that party's expense."). Here, Global paid $175,000 to 3E under the terms of the Manufacturing Agreement. However, Global has unequivocally abandoned its unjust enrichment claim and any claim to damages "due to the Manufacturing Agreement's failure." ECF No. 86 at 43 n.7. Therefore, neither party has proved its claims against the other and neither party is entitled to damages or restitution.

## V.    CONCLUSION

Neither Plaintiff and Counterclaim Defendant 3EMobile nor Defendant and Counterclaimant Global Cellular has established that the parties who signed the Manufacturing Agreement had an enforceable contract. Indeed, the evidence at trial confirmed that neither party understood how to bring the purpose of the agreement—the provision of products by 3E to Global Cellular—to fruition. Without an enforceable agreement, there is no basis for a breach of contract claim on either side. Therefore, judgment will be entered dismissing this case with prejudice.

**SO ORDERED.**

Date: March 19, 2019

_____

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

---

*Quandry Solutions Inc. v. Verifone Inc.*, Civil Action No. 07-097, 2009 WL 997041, at *16 (E.D. Pa. Apr. 13, 2009) (internal citations omitted). Therefore, Global cannot succeed on a claim for breach of the duty of good faith and fair dealing, either.